# EXHIBIT A

*Alaska*

Under Alaska law, "a DNA sample and the results of a DNA analysis performed on the sample are the *exclusive* property of the person sampled or analyzed." (AS 18.13.010(a)(2) (*emphasis added*)). 23andMe possesses no property rights in these samples or in these results. It therefore cannot sell them, because it has no property right to sell. 23andMe merely retains the samples and results on behalf of the Alaskans who actually own the samples, and who have the statutory right to revoke 23andMe's ability to retain the samples and results at any time. (AS 18.13.010(c)).

At most, Alaska law provides that the results of DNA testing can be "disclosed" (again, without transferring any property rights). However, it is illegal and, if done knowingly, a crime, for a person to analyze DNA samples, retain DNA samples, or disclose DNA test results without the informed written consent of the person whose genes the DNA reflects or their legal guardian or authorized representative. (AS 18.13.010(a); AS 18.13.030). "A general authorization for the release of medical records or medical information may not be construed as the informed and written consent" required by Alaska's genetic privacy law. (AS 18.13.010(c)).

In short, 23andMe cannot sell Alaskans' DNA samples or test results because it has no property interest to sell. It cannot disclose the results of an Alaskan's DNA test unless it has the informed, written consent of its Alaskan owner, and the person to whom 23andMe might disclose the results to cannot retain or disclose them without the informed, written consent of the Alaskan owner. Again, Alaskans retain the right to revoke their consents at any time. (AS 18.13.010(c)).

*Arizona*

Arizona law requires direct-to-consumer genetic testing companies to obtain separate express consent from the consumer for the specific purpose of transferring or disclosing the consumer's genetic data to a buyer. Ariz. Rev. Stat. §§ 44-8001(5), 44-8002(A)(2)(b)(i). This separate consent requirement is backed by significant privacy protections for a consumer's genetic information. Ariz. Rev. Stat. § 44-8002(A)(6). The results of genetic testing are confidential and considered privileged to the consumer tested, and can only be released to: the consumer, anyone that the consumer authorizes in writing to receive it, or the consumer's healthcare decision maker. Ariz. Rev. Stat § 12-2082(A). In addition, separate express consent from the consumer must be provided for the direct-to-consumer genetic testing company to use the consumer's genetic data beyond the primary purpose of the genetic testing product and its inherent contextual uses. Ariz. Rev. Stat. § 44-8002(A)(2)(b)(iii). Notwithstanding any other consent obtained, a direct-to-consumer genetic testing company may never disclose consumer genetic data to any entity offering health insurance, life insurance, or long-term care insurance or to any employer of a consumer. Ariz. Rev. Stat. § 44-8002(B).

Further, under Arizona law the genetic testing information of a deceased consumer cannot be transferred at all based on consent provided by the consumer while still alive. *See* Ariz. Rev. Stat

§ 12-2082(F). Rather, it can *only* be released to the deceased consumer's last healthcare decisionmaker and the personal representative of the consumer's estate or next of kin. Ariz. Rev. Stat § 12-2294(D). And a deceased consumer's testamentary document may impose further limitations on the release of genetic testing information. Ariz. Rev. Stat § 12-2082(F).

*Colorado*
Genetic data constitutes sensitive data under the Colorado Privacy Act. C.R.S. 6-1-1303(24)(b). Pursuant to C.R.S. 6-1-308(7), controllers are required to obtain a consumer's consent prior to selling their sensitive data.

*Delaware*
Delaware law, DEL. CODE ANN. TIT. 16, §§ 1201 to 1208, prohibits the disclosure of genetic information about an individual in a manner that permits identification of the individual without obtaining informed consent of the tested individual describing the information to be disclosed and to whom the information will be disclosed.

*Florida*
Florida's "Protecting DNA Privacy Act" was signed into law on June 29, 2021 and took effect on October 1, 2021as Florida Statute § 817.5655, Unlawful Use of DNA. The law enhances individual ownership over one's genetic information.  The law restricts the use and handling of DNA without express consent.
The law includes criminal penalties up to a second-degree felony in the State of Florida for violation of the statute.

Florida's law requires "**express consent**" to: 1) collect or retain another person's DNA sample with the intent to perform DNA analysis;
2) submit another person's DNA sample for DNA analysis or conduct or procure the conducting of another person's DNA analysis;
3)  disclose another person's DNA analysis results to a third party; and
4) sell or otherwise transfer another person's DNA sample or the results of another person's DNA analysis to a third party, regardless of whether the DNA sample was originally collected, retained or analyzed with express consent.

*Illinois*
Under Illinois's *Genetic Information Privacy Act*, 410 ILCS 513/1, *et seq*. (Act), all medical and commercial genetic testing and information derived therefrom is confidential and privileged and may be released only to the individual tested and to persons specifically authorized by that individual in writing to receive the information. The Act forbids disclosure of testing results to another person except as authorized under the Act.

 The Act permits disclosures without express written consent in some circumstances for certain law enforcement and health care purposes.  However, the Act prohibits the solicitation of genetic

testing or genetic information as a condition of employment, preemployment application, labor organization membership, or licensure.

*Kentucky*

Kentucky's genetic privacy statute, KRS 311.705, effective July 14, 2022, requires 23andMe to obtain "express consent" for "transferring or disclosing the consumer's genetic data to any person other than the company's vendors and service providers, or for using genetic data beyond the primary purpose of the genetic testing product or service and inherent contextual uses.

*Maryland*

Maryland's Genetic Information Privacy Act ("Maryland's GIPA") regulates direct-to-consumer ("DTC") genetic testing companies like 23andMe, creating obligations for the collection, use, and disclosure of genetic data. Among other things, Maryland's GIPA requires DTC companies to obtain "express consent for transferring or disclosing the consumer's genetic data to a person other than the company's vendors or service providers" and for "using genetic data beyond the primary purpose of the genetic testing product or service requested by the consumer." Md. Com. Law §§ 14-4404(2) and (3). Maryland's GIPA further states that express consent requires an "affirmative response by a consumer to a specific, discrete, freely given, and unambiguous notice regarding the *collection, use, or disclosure* of the consumer's genetic data *for a specific purpose. Id*. at § 14-4401(f) (emphasis added). In order to sell or transfer genetic data, 23andMe must obtain express consent from the consumer in accordance with Maryland's GIPA.

Obtaining explicit, affirmative consent from consumers before transferring genetic data in bankruptcy is especially critical in light of Maryland's strict ban on sharing data collected by DTC companies, absent consent, with insurers or employers. *Id*. at § 14-4405(d). Without this consent, consumers who relied on this protection when providing their genetic data, could unexpectedly lose it, potentially facing serious negative consequences.

*Minnesota*

Minnesota's Genetic Information Privacy Act forbids the sale or transfer of genetic information without the consumer's express consent. The law specifies that a direct-to-consumer genetic testing company must obtain "separate express consent" before each transfer or disclosure of the consumer's genetic data or biological sample to any person other than the company's vendors and service providers. Minn. Stat. § 325F.995, subd. 2(a)(2)(ii) (emphasis added). The law also requires "separate express consent" from the consumer for each use of genetic data or biological sample that is beyond the primary purpose of genetic testing services. Id. § 325F.995, subd. 2(a)(2)(iii). Because the sale of genetic data in this bankruptcy matter contemplates both the transfer and disclosure of genetic material to persons other than 23andMe, and is outside of the primary purpose and services provided by 23andMe, Minnesota law requires each consumer provide separate express consent before their genetic data or biological sample is sold or transferred to another company. Under Minnesota's law, express consent means "a consumer's

affirmative written response to a clear, meaningful, and prominent written notice," which may be presented and captured electronically. *Id*. § 325F.995, subd. 1(f).

### *Montana*
Montana law requires express consent for the sale of consumer genetic data. Mont. Code Ann. § 30-23-104(3)(c)(iii). Montana law also requires express consent for the use of consumer genetic data "beyond the primary purpose of the entity's genetic testing product or service." Mont. Code Ann. § 30-23-104(3)(a)(ii). Finally, Montana law restricts where genetic data of Montana residents may be stored and imposes additional consent requirements on storing genetic data outside the United States. Mont. Code Ann. § 30-23-104(7).

### *New Hampshire*
New Hampshire has a genetic privacy statute (N.H. RSA § 141-H) and data privacy statute (N.H. RSA § 507-H) which prohibits the sale of genetic data without consent. The genetic privacy statute applies to genetic testing which is defined as any test that identifies the "presence, absence or alteration" of any gene or chromosome as well as any "report, interpretation or evaluation" of such a test. The statute prohibits both the disclosure that an individual has undergone genetic testing as well as the results of the test absent prior written and informed consent of the individual, or that of a guardian if the individual is a minor. In addition, under the data privacy statute, genetic testing data of the type collected by 23andMe would be considered Sensitive Data. Although the definition of "sale of personal data" does not include the transfer of personal data as a bankruptcy asset, Sensitive Data is held to a higher standard than general personal data under N.H. RSA 507-H. It is the State's position that the processing required to transfer Sensitive Data as a bankruptcy asset requires consumer consent under N.H. RSA 507-H:6, in addition to the parallel requirements of N.H. RSA 141-H.

### *New Jersey*
The New Jersey Genetic Privacy Act, N.J.S.A 10:5-43 to 49, requires informed consent prior to obtaining an individual's genetic information. The New Jersey Data Privacy Law, N.J.S.A. 56:8-166.4 to 166.19, covers genetic/biometric data and requires that a controller "clearly and conspicuously disclose such sale or processing, as well as the manner in which a consumer may exercise the right to opt out of such sale or processing.

### *New Mexico*
New Mexico law requires informed and written consent for the collection, analysis, retention, transmission, or use of genetic information. Therefore, any sale or transfer of such data by 23andMe must be preceded by obtaining express consent from the individual, in accordance with NMSA 1978, §§ 24-21-3 and 24-21-5.

*New York*
Under New York Civil Rights Law (CVR) § 79-L, any further disclosure of genetic test results to individuals or organizations not initially named in the informed consent requires the further informed consent of the subject of the test.

*North Carolina*
The North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, prohibits unfair and deceptive acts in commerce. 23andMe's potential sale of consumers' personally identifiable information, including their genetic information, may be both deceptive and unfair under North Carolina law.

*Pennsylvania*
The Commonwealth of Pennsylvania, Office of Attorney General, Bureau of Consumer Protection ("Commonwealth of PA") generally objects to the sale of consumers' personally identifiable genetic information ("PIGI") collected by, and in the possession of, Debtors in this bankruptcy. It has been widely acknowledged, including by Debtors, that at different times during the course of the operation of Debtors' business, Debtors employed varying versions of a privacy policy. Notably, Debtors' historic privacy policies have been more restrictive than Debtors' privacy policy currently in effect. Therefore, a vast number of consumers agreed to purchase Debtors' services and provide their PIGI with the expectation that their PIGI would not be transferred or sold to an unrelated or unaffiliated third party, at least not without consumers' express consent.

Therefore, the Commonwealth of PA asserts that the proposed sale or transfer of consumers' PIGI is prohibited by, and unlawful under, the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PA Consumer Protection Law"), 73 P.S. § 201-1 *et seq*. The PA Consumer Protection Law declares unlawful certain unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce which is defined, in part, to include "engaging in any other fraudulent or deceptive conduct which creates the likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)(xxi). The Pennsylvania Supreme Court has long recognized that the PA Consumer Protection Law is to be construed liberally so that unfairness and deception in all consumer transactions be halted. *Commonwealth v. Monumental Properties*, 459 Pa. 450, 461, 329 A.2d 812, 817 (1988). The PA Consumer Protection Law was designed to promote full disclosure of information to consumers. *Gabriel v. O'Hara*, 368 Pa. Super. 383, 534 A.2d 488, 491, n.6 (1987).

Indeed, for many consumers the sale of their PIGI would violate the privacy policies to which they may have previously consented, and, therefore, violates the PA Consumer Protection Law.

*South Carolina*
South Carolina law forbids the sale or transfer of genetic information without express consent. See S.C. Code Ann. section 38-93-40.

*Tennessee*
Tennessee's Genetic Information Privacy Act ("GIPA") regulates direct-to-consumer genetic testing companies, such as 23andMe. *See* Tenn. Code Ann. § 47-18-4902, 4904. The GIPA requires direct-to-consumer genetic testing companies to obtain *express consent* before collecting, using, or disclosing a consumer's genetic data. *Id.* § 47-18-4904(a)(2). In obtaining such consent, the company must (1) clearly describe its use of the genetic data, (2) specify who has access to any test results, and (3) specify how the company may share the genetic data. *Id.* A company must also obtain *separate express consent* before, among other things, (1) transferring or otherwise disclosing a consumer's genetic data to a person other than the company's vendors or service providers or (2) using the genetic data beyond the primary purpose of the company's genetic testing product or service. *Id.* § 47-18-4904(a)(3)(A)(i)-(iii). Under the GIPA, express consent means a consumer's affirmative response to a "clear, meaningful, and prominent notice regarding the collection, use, or disclosure of genetic data for a specific purpose." *Id.* § 47-18-4902(6). The GIPA also requires companies to provide a process by which consumers can (1) access their genetic data, (2) delete their account and genetic data, and (3) destroy their biological sample. *Id.* § 47-18-4904(a)(6)(A)-(C).

On July 1, 2025, the Tennessee Information Protection Act ("TIPA") will become effective. The TIPA provides Tennessee consumers with certain personal information rights and places new obligations on controllers and processors of data, among other things. Under the TIPA, consumers have the right to access, correct, delete, and obtain a copy of their data, as well as a right to opt-out of the sale or processing of their personal information for certain purposes. Tenn. Code Ann. § 47-18-3304. The TIPA also imposes key requirements on data controllers, including a duty to: (1) provide a clear, meaningful privacy notice; (2) limit the collection of personal information to what is adequate, relevant, and reasonably necessary for the disclosed purposes; (3) not process personal information for purposes beyond what is reasonably necessary and compatible with the disclosed purposes, unless consent is obtained; (4) not process sensitive data without a consumer's express consent; (5) clearly disclose the sale of personal information to third parties; (6) establish and maintain reasonable data security practices to protect the confidentiality, integrity, and accessibility of personal information; and (7) provide a secure, reasonable means for consumers to exercise their rights under the statute, among other things. *Id.* § 47-18-3305. Under the TIPA, consent means "a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal information relating to the consumer." *Id.* § 47-18-3302(6)(A). Though the TIPA excludes bankruptcy acquisitions from the definition of a "sale", neither the TIPA nor the GIPA include blanket applicability exemptions for entities in bankruptcy.

*Texas*
The Texas Direct-to-Consumer Genetic Testing Act (the "DTC Genetic Testing Act") regulates companies like 23andMe and provides consumers with certain rights and protections over their biological samples and genetic data. *See* Tex. Bus. & Com. Code §§ 503A.001-.008. Under the

DTC Genetic Testing Act, Texans have an exclusive property right in, and right to exercise exclusive control over, their biological sample and genetic data. *Id*. § 503A.003. Debtors must obtain Texans' <u>*separate* express consent</u> to (a) transfer or disclose the individual's genetic data to any person other than the company's vendors and service providers; (b) use genetic data for a purpose other than the primary purpose of the company's genetic testing product or service; or (c) retain the biological sample following completion of the initial testing service. *Id*. § 503A.006(a)(1). Specifically, the Debtors must obtain a separate "affirmative response to a clear and meaningful notice regarding the collection, use, or disclosure of genetic data for a specific purpose." *Id*. § 503A.001(5). The consumer's click-through acceptance of 23andMe's Terms of Service and Privacy Statement upon signing up for services does not meet the <u>*separate* express consent</u> requirement as defined by the DTC Genetic Testing Act. 23andMe may not transfer or disclose Texans' genetic data and biological samples or deprive Texans of their property rights and rights to exercise exclusive control without their <u>*separate* express consent</u>.

Further, under the Texas Data Privacy and Security Act (the "TDPSA"), Debtors must obtain a Texan's consent to process their sensitive data. *See* Tex. Bus. & Com. Code §§ 541.101(b)(4). "Processing" includes the disclosure of personal information, including sensitive data such as a Texan's genetic or biometric data and mental or physical health diagnosis. *Id*. § 541.001(22) (defining "process" to include disclosure) and § 541.001(29) (defining "sensitive data"). Consent under the TDPSA "means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer." *Id*. § 541.001(6). A consumer's consent is not obtained through the "acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information; hovering over, muting, pausing, or closing a given piece of content; or agreement obtained through the use of dark patterns." *Id*. The click-through acceptance of 23andMe's Terms of Service and Privacy Statement does not meet the consent requirement as defined under the TDPSA. 23andMe does not have the requisite consent of Texans to disclose their genetic data and medical information to a third-party buyer.

### *Utah*
Utah Code § 13-60-104(1)(c) ("Utah Genetic Information Privacy Act") requires 23andMe to obtain a consumer's separate express consent for the transfer or disclosure of the consumer's genetic data to any person other than the company's vendors and service providers. Utah's Genetic Information Privacy Act further states that express consent requires 23andMe to obtain a consumer's affirmative response to a clear, meaningful, and prominent notice regarding any transfer.

### *Vermont*
The Vermont Consumer Protection Act, 9 V.S.A. Chapter 63, prohibits unfair and deceptive acts in commerce. 23andMe's potential sale of consumers' personally identifiable information, including their genetic information, may be both deceptive and unfair under Vermont law. 23andMe's sale of consumers' personally identifiable information may amount to deceptive

conduct to the extent that 23andMe made representations to consumers that their information would be protected, secured, and/or otherwise under consumers' control, whether those representations were made in 23andMe's advertisements or in the various versions of 23andMe's publicly available privacy policies at the time of consumers' purchases. 23andMe's sale of this information may also constitute unfair business practices to the extent such sale may cause a substantial injury to consumers. The Vermont Supreme Court has held that the Vermont Consumer Protection Act is a remedial statute that must be applied liberally to accomplish its purposes, meaning that Vermont courts will defer to broader interpretations of the statute when assessing whether any particular acts affecting consumers might implicate the act's prohibitions. *Carter v. Gugliuzzi,* 168 Vt. 48, 52, 716 A.2d 17, 21 (1998).

***Virginia***
Virginia has a Genetic Data Privacy law which states that "[e]very direct-to-consumer genetic testing company shall obtain a consumer's express consent for the collection, use, and disclosure of the consumer's genetic data, including, at a minimum, separate and express consent for . . . [e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party other than a service provider, including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed." Va. Code § 59.1-596(B)(4).  If a direct-to-genetic data testing company fails to comply with this requirement, the Attorney General may bring an enforcement action to obtain injunctive relief and seek civil penalties, attorney fees, and expenses.  Va. Code. § 59.1-601.  In addition, genetic data is defined as sensitive data under Virginia's Consumer Data Protection Act.  Va. Code § 59.1-575.  This Act requires that controllers "[n]ot process sensitive data concerning a consumer without obtaining the consumer's consent." Va. Code § 59.1-578(A)(5).